

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-25-00099-CV

ANNA TEXAS LAND, LTD., AND E. TAYLOR ARMSTRONG, JR., Appellants

V.

ANACAPRI LAGUNA AZURE, LLC, Appellee

On Appeal from the 95th District Court
Dallas County, Texas
Trial Court No. DC-25-06901

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

This is an interlocutory appeal from a temporary injunction entered by the Ninety-fifth Judicial District Court of Dallas County.[1] On April 29, 2025, Appellee, Anacapri Laguna Azure, LLC (Megatel),[2] filed a verified petition and application for injunctive relief and temporary restraining order, alleging a cause of action for breach of contract, and sought a declaratory judgment that, pursuant to its contract with Appellants, Anna Texas Land, LTD and E. Taylor Armstrong, Jr. (the Armstrongs),[3] Megatel could enter their land to construct a water drainage channel across it. The trial court granted Megatel's request for a temporary injunction and entered an order enjoining the Armstrongs from obstructing Megatel's access to their property and from interfering with the completion of Megatel's construction of the water drainage channel.

The Armstrongs appeal, maintaining that the trial court erred when it granted Megatel's requested injunctive relief.[4] In three points of error, the Armstrongs argue that (1) the temporary injunction must be dissolved because the trial court twice erred by upsetting the status quo and

---

[1]Originally appealed to the Fifth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (Supp.).

[2]In its appellate brief, Appellee is referred to as "Megatel." For the purposes of simplification, we will refer to Appellee as "Megatel" in our opinion.

[3]We will refer to Appellants collectively as "the Armstrongs." When referring to E. Taylor Armstrong, Jr., individually, we will identify him as "Taylor."

[4]Section 51.04(a)(4) of the Texas Civil Practice and Remedies Code allows a party to appeal from an interlocutory order that "grants or refuses a temporary injunction or grants or overrules a motion to dissolve a temporary injunction as provided by Chapter 65" of the Texas Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(4) (Supp.).

granting relief when Megatel had an adequate remedy at law, (2) there is nothing "temporary" about the rights granted to Megatel, and (3) there was no contract between the parties.

Because we find that the trial court erred by (1) failing to maintain the status quo of the subject matter of the underlying lawsuit pending its final disposition; and (2) effectively determining the merits of Megatel's breach-of-contract and declaratory-judgment claims, we dissolve the trial court's temporary injunction order and remand this case to the trial court for further proceedings consistent with this opinion.

## I.  Factual Background

Megatel is a land development company engaged in constructing "large-scale, master-planned [residential] communities."  Megatel purchased a large piece of property in Anna, Texas, with the intent to develop it into a community consisting of "1,000 single-family and multi-family homes."  The project, which was known as Anacapri Phase 2, required a flood-control channel across a tract of land that is located south of the intended development.  That land is owned by the Armstrongs.  In pursuit of its goal, Megatel began discussions with the Armstrongs toward the end of 2023.  In addition, outside companies that were working with or for Megatel contacted the Armstrongs and also began having discussions with them.

On December 7, 2023, Scott Minnis, the project manager for a company called "McAdams," sent Taylor a letter informing him that the City of Anna was reviewing Megatel's proposal to begin a single-family residential development in the city.  Minnis explained that there were floodplain and stormwater issues and that managing those issues would be required as part of the project.  "The purpose of th[e] letter [wa]s to provide a preview of the floodplain

3

delineation in advance of the formal [Federal Emergency Management Agency (FEMA)] submittal and answer any questions you may have." The letter included an acknowledgement, with a place for Taylor's signature, stating that he understood that as a part of the construction of the development, Megatel would "be adjusting the flood plain limits on [the Armstrongs'] property by constructing a channel to help direct storm water to Rosamond Parkway." Minnis further explained,

> The proposed floodplain is not a FEMA floodplain, however, the floodplain accepted by the City of Anna will be submitted to FEMA for conditional acceptance prior to construction. Once construction activity is complete, the project will make another submittal to FEMA to formally revise the FEMA Flood Insurance Rate Map (FIRM).

Minnis informed Taylor that they "look[ed] forward to answering questions [he] may have." Minnis attached to his letter copies of survey plans showing the then existing and proposed floodplains. There is nothing in the record to indicate that Taylor signed the letter at that time.

On March 12, 2024, Minnis sent another letter to Taylor informing him that the City of Anna was still reviewing Megatel's proposed residential development plan, and Minnis also explained the process of making the modifications to the existing floodplain. Much like his December 7, 2023, letter, Minnis stated, "The purpose of th[e] letter [wa]s to provide a preview of the floodplain delineation in advance of the formal FEMA submittal and answer any questions [Taylor] may have." He also informed Taylor that Greg Peters, the Assistant City Manager, and Steven Maglisceau[5] had corresponded by email on March 8, 2024, and that "the City of Anna proposed the follow [sic] solutions." One of the solutions was that "McAdams [would] provide

---

[5]Maglisceau is the Vice President of Land Acquisitions and Development for Megatel.

4

to [Taylor] a revised letter and exhibit for his signature agreeing to the proposed CLOMR/LOMR [(Letter of Map Revision)]," and "[Taylor] [would] work with members of his trust to receive authorization to execute the revised agreement." On May 23, 2024, Taylor signed Minnis's March 12, 2024, letter, adding the following language: "Subject to the appropriate provisions of the attached letter from the City of Anna." Megatel contends that Minnis's March 12, 2024, letter that was signed by Taylor on May 23, 2024, amounted to an enforceable contract between the Armstrongs and Megatel.

The "attached letter" referenced above was written by Wes Lawson, Engineer for the City of Anna, and it contained potential resolutions to some of Taylor's concerns about the project.

> [By Taylor:] – *"Additionally we would like the City to grant us two curb cuts along Ferguson Pkwy with corresponding median cuts. We would also like assurances that at least three curb cuts with corresponding median cuts be granted along our Rosamond frontage."*

> [Lawson's Response:] Median openings and drive cuts shall be approved by the City for your property in accordance with City standards for access and driveway spacing. There are some median openings already planned on Ferguson for the Woods at Lindsey and Anacpri [sic] developments. The City has provided you the preliminary plats for both developments to show these locations. There should be sufficient space to accommodate the number of curb cuts that you are requesting. Final locations of curb cuts for your property will be based on site plans at the time of the development.

On May 23, 2024, Taylor also signed a special warranty deed for right of way, transferring ownership of the Armstrongs' property to the City of Anna. Again, he added the language, "[s]ubject to the appropriate provisions of the attached letter from the City of Anna."

The record shows that sometime around March 2025, Taylor began reconsidering his position on Megatel's use of his property. On March 10, 2025, Keith Johansen, Megatel Homes,

5

LLC's land development manager, emailed Taylor and William Armstrong, Taylor's son, asking them to meet "to review the documents on th[e] email thread and answer any questions [they might] have."  Johansen also stated, "We look forward to getting these [two] agreements executed with you."  Taylor responded that he had questions for a person named Gene Peters and that he had been unsuccessful in reaching him.  Taylor stated, "As soon as we have talked, I will get back to you."  On March 17, 2025, Taylor sent another email to Johansen, stating that he had continued to try to speak with Peters but "with no luck."

On April 4, 2025, Taylor sent Johansen an email, stating,

Keith:

I calked [sic] and talked with Wes last Friday after our call.  [In] fact, we ended our call [when] he saw you were calling him.  I explained that we wanted to know what would be involved in converting the drainage ditch into a culvert with the approximate cost.

As I was writing this, Wes called me and I got the information I needed.  He estimates the coat [sic] of that conversion at $2 million.  Anything you could do to reduce that would be appreciated.  I've gotten what I need from Wes.

On April 9, 2025, Derek Borg, Vice President of Commercial Development for Megatel Homes, sent Taylor an email, which stated,

To follow up on your last question, we can only do the grade to drain **that you originally agreed to by open channel.  Megatel is prepared to move forward on this project immediately.  Please let me know if there is any reason we cannot begin.  We need this constructed ASAP to not have delays in the project. Thanks.**

On April 10, 2025, Taylor sent an email to Borg, explaining that he had spoken with his family and that they were concerned about Megatel's request for a drainage easement on their

6

property. Taylor concluded his email, declaring, "As we consider our options, we cannot agree to let you proceed."

On April 17, 2025, on behalf of the Armstrongs, Taylor sent a letter via certified mail stating, in part, "While an open channel through our property might solve your drainage problem, it would significantly diminish the value of our remaining [twenty-seven] acres. We have been advised by our legal counsel that we are well within our rights to deny your request for a drainage easement through our property."

On April 29, 2025, Megatel filed a verified petition and application for injunctive relief and a temporary restraining order, alleging a breach-of-contract claim based on the May 23, 2024, letter signed by Taylor. Megatel also requested a declaratory judgment that it had the legal right to access and construct drainage improvements under the agreement.

The trial court held a three-day hearing on Megatel's petition for a temporary injunction, beginning on July 16, 2025, continuing on August 7, 2025, and concluding on August 29, 2025. As in its petition, Megatel maintained that, if the requested relief was not granted, it would suffer irreparable harm and face continued uncertainty about its rights. The Armstrongs argued that Megatel's requested relief was inappropriate because, among other things, a temporary injunction is only necessary to preserve the status quo and allowing Megatel to access their property to construct a drainage channel did not preserve the status quo. The Armstrongs also argued that Megatel had a remedy at law in the form of monetary damages.

The trial court granted Megatel's petition, and on September 3, 2025, it entered the following order:

1.	The Court has jurisdiction over this matter and over the parties.

2.	The Court hereby finds, for purposes of this Temporary Injunction only, that [Megatel] has presented evidence sufficient to demonstrate: (1) a valid cause of action; (2) a probable right to the relief sought (specific performance); and (3) a probable, imminent, and irreparable injury in the absence of injunctive relief. The Court finds that [Megatel] has satisfied the requirements for a temporary injunction under Texas Civil Practice & Remedies Code § 65.011. These findings are made solely for purposes of this Temporary Injunction and are further supported by the record as set forth below.

3.	The Court hereby finds, for purposes of this Order only, that [the Armstrongs] entered into a valid and enforceable agreement on May 23, 2024 (the "Agreement") (attached to [Megatel's] Petition as Exhibit A), authorizing [Megatel] to access [the Armstrong's] property and construct flood control and drainage improvements necessary for the Anacapri Phase 2 development. [Megatel] substantially relied on this agreement by obtaining City approvals, completing design and permitting, and mobilizing contractors. [The Armstrongs] subsequently revoked access without legal justification, which constitutes a breach of the agreement and threatens the viability of the development. [Megatel] has demonstrated a probable right to relief on its claims for breach of contract and declaratory judgment.

1.[sic] [Megatel] has shown a probable, imminent, and irreparable injury absent injunctive relief. [Megatel] faces immediate and irreparable harm, including:

- The inability to construct a drainage system required to comply with City ordinances and floodplain management standards;

- The loss of permits and governmental approvals that are expressly conditioned on the timely completion of public infrastructure;

- Exposure to penalties, indemnity claims, and contractual defaults under agreements with contractors, consultants, lenders, and development partners;

- The potential collapse of the Anacapri Phase 2 development and loss of all future revenue streams derived

8

from home sales, community amenities, and related commercial activities—totaling tens of millions of dollars;

- The devaluation of property within the project footprint that can no longer be permitted, marketed, or developed as planned;

- The loss of all of [Megatel's] multi-million dollar investment in design, entitlement, engineering, and infrastructure—all of which were made in reliance on the enforceability of the agreement and all of which become sunk costs if the project cannot proceed[;]

- Loss and interference with [Megatel's] use of its property interests, including critical City permits and approvals; [and]

- Public interest harm related to delayed infrastructure.

4. The Court further finds, for purposes of this Order only, that the balance of equities favors [Megatel]. The harm to [Megatel's]—loss of a permitted development and massive investment—greatly outweighs any burden to [the Armstrongs], who previously agreed to the improvements and derive benefit from the infrastructure. The Court finds, for purposes of this Order only, that the injunction serves the public interest by enabling completion of required drainage improvements as contractually agreed.

5. The Court further finds, for purposes of this Order only, that [Megatel] has no adequate remedy at law. Monetary damages cannot fully redress the consequences of halted construction, regulatory default, and cascading development failures.

6. Accordingly, to preserve the status quo during the pendency of this action, [the Armstrongs], and their officers, agents, employees, attorneys, and all persons acting in concert with them, are hereby **RESTRAINED AND ENJOINED** from:

- Denying or obstructing [Megatel's] reasonable access to the subject property for the purpose of conducting drainage construction as described in the parties' May 23, 2024, agreement;

9

- Interfering with or delaying the completion of such construction;

- Revoking or purporting to revoke the access previously granted by the Agreement;

- Taking any action to impede, prevent, or delay the implementation of the agreed drainage improvements essential to the Anacapri Phase 2 development.[6]

This appeal followed.

## II.    Discussion

### A.    Standard of Review

"A reviewing court should reverse an order granting injunctive relief only if the trial court abused [its] discretion." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). "A trial court abuses its discretion [when] it acts without reference to guiding rules and principles such that the ruling is arbitrary or unreasonable." *Brewer v. Lennox Hearth Prods., LLC*, 601 S.W.3d 704, 717 (Tex. 2020). "Under this standard, we defer to the trial court's factual findings if they are supported by the evidence, but we review legal determinations de novo." *State v. Loe*, 692 S.W.3d 215, 226 (Tex. 2024) (citing *Haedge v. Cent. Tex. Cattlemen's Ass'n*, 603 S.W.3d

---

[6]The trial court's temporary restraining order was not as broad as its temporary injunction order.

It is therefore **ORDERED, ADJUDGED, and DECREED** that [the Armstrongs] and all of [the Armstrongs'] officers, agents, employees, and any persons acting in concert with [the Armstrongs], are hereby immediately:

- Restrained from interfering with or obstructing [Megatel's] access to the property to survey and view the property. [The Armstrongs] are enjoined from preventing the [Megatel] from "staking" the subject property. [Megatel] shall not destroy, impair, conduct any tests, or otherwise physically change the subject property.

824, 827 (Tex. 2020) (per curiam)).  It is not an abuse of discretion "if some evidence reasonably supports the trial court's decision."  *Butnaru*, 84 S.W.3d at 211.

> We confine our review to the evidence presented at the temporary injunction hearing.  A party seeking injunctive relief has the burden of pleading and proving a probable right to relief.  *Butnaru*[,84 S.W.3d at 204].  A trial court abuses its discretion if it enters a temporary injunction unsupported by the evidence.  *Operation Rescue-Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 975 S.W.2d 546, 560 (Tex. 1998).

*State v. Zurawski*, 690 S.W.3d 644, 654 n.3 (Tex. 2024).

### B.      Maintaining the Status Quo

"Except in limited circumstances, the law generally does not permit prejudgment enforcement of a party's claims for relief."  *Harley Channelview Props., LLC v. Harley Marine Gulf, LLC*, 690 S.W.3d 32, 37 (Tex. 2024).  "The extraordinary remedy of a temporary injunction is one of those exceptions, intended to preserve the status quo until final judgment."  *Id.*

"To obtain a temporary injunction, [the applicant] must show '(1) a cause of action against the party to be enjoined; (2) a probable right to recover on that claim after a trial on the merits; and (3) a probable, imminent, and irreparable injury absent the temporary injunction.'"  *Webb Consol. Indep. Sch. Dist. v. Marshall*, No. 24-0339, 2026 WL 1108676, *5 (Tex. Apr. 24, 2026) (quoting *Harley Channelview Props.*, 690 S.W.3d at 37).  If even one of these three requirements is absent, an appellate court must reverse the injunction on appeal.  *Abbott v. Harris Cnty.*, 672 S.W.3d 1, 8 (Tex. 2023).  That said, "[a] temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits."  *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 555 (Tex. 2016) (quoting *Butnaru*, 84 S.W.3d at

11

204).  "The 'status quo' is the 'last, actual, peaceable, non-contested status which preceded the pending controversy.'"  *Id.* (quoting *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (orig. proceeding) (quoting *Janus Films, Inc. v. City of Fort Worth*, 358 S.W.2d 589, 589 (1962) (per curiam) (orig. proceeding))).

According to the Armstrongs, "***The historic and current state of Anna's acreage is undisputed by the parties***."  They contend that maintaining the status quo means that their property remains "in its natural state *without* a drainage channel dividing it into two separate pieces."  The Armstrongs assert that the trial court's temporary injunction did not maintain the status quo because it allowed Megatel to immediately enter their property and make changes to their land, including constructing the drainage channel and modifying the current floodplain.  The Armstrongs argue that because the trial court's temporary injunction did not maintain the status quo but instead changed it, they ask this Court to dissolve the injunction in favor of Megatel.

According to Megatel, the challenged temporary injunction preserves the status quo pending trial on the merits of its lawsuit.  Megatel contends, "The last peaceable, non-contested status was the post-agreement relationship, where [the Armstrongs] cooperated for nearly a year as Megatel proceeded with approvals and related work."  It concluded,

> [T]he status quo is the last peaceful act *prior* to Armstrong's breach.  The status quo is where Megatel has the right to build the drainage channel; not the alternate world [the] Armstrong[s] created when [they] repudiated the parties' agreement.  Otherwise, every party will exercise "self help" and claim the altered universe is the status quo and can't be disturbed.  This memorializes a party's "right" to commit a wrong and avoid temporary relief.

12

Courts in this State have consistently held that (1) the sole purpose of a temporary injunction is to preserve the status quo pending final disposition of the underlying lawsuit, and (2) when addressing the status quo, a trial court may not decide the merits of the parties' underlying dispute. *Wolfe v. Wolfe Madewell 2019 LLC*, No. 05-24-01430-CV, 2025 WL 1994858, at *6 (Tex. App.—Dallas July 17, 2025, no pet.) (mem. op.); *Rios v. Frias*, No.01-24-00142-CV, 2024 WL 4594836, at *5 (Tex. App.—Houston [1st Dist.] Oct. 29, 2024, no pet.) (mem. op.); *In the Matter of Prop. at Meandering Way Dallas*, No. 05-21-00979-CV, 2022 WL 2302168, at *4 (Tex. App.—Dallas July 27, 2022, no pet.) (mem. op.); *Bright Land & Cattle, LLC v. PG-M Int'l, LLC*, No. 07-16-00336-CV, 2017 WL 986181, at *3 (Tex. App.—Amarillo Mar. 9, 2017, no pet.) (mem. op.); *Patel v. St. Luke's Sugar Land P'ship, L.L.P.*, 445 S.W.3d 413, 420 (Tex. App.—Houston [1st Dist.] 2013, pet. denied); *Pharaoh Oil & Gas, Inc. v. Ranchero Experanza, Ltd.*, 343 S.W.3d 875, 881 (Tex. App.—El Paso 2011, no pet.).

For instance, in 1957, the Beaumont Court of Appeals reasoned that (1) maintaining the status quo before entry of a final judgment was so important that it dissolved the trial court's temporary injunction, even though it overruled the appellant's argument that the appellee failed to prove the three factors necessary to warrant entry of a temporary injunction, and (2) it could not reach the underlying merits of the lawsuit. *Taylor v. Gulf Oil Corp.*, 303 S.W.2d 541, 542–43 (Tex. App.—Beaumont 1957, no writ).

*Taylor* was a suit in trespass to try title between Gulf Oil Corporation (Gulf Oil) and Albert Lee Taylor (Albert). *Id.* at 541. The property at issue was 13.2 acres of a 100-acre tract alleged to have been conveyed to Gulf Oil in 1915. *Id.* Albert maintained that he owned the

13.2 acres under a ten-year statute of limitations. *Id.* The controversy arose when Gulf Oil "attempt[ed] to cross a portion of one corner of the said 13.2 acres by burying thereon a salt-water discharge line from a well adjoining it." *Id.* The saltwater discharge "line was to flow into a cavity well on other property" owned by Gulf Oil, which also adjoined the 13.2 acres. *Id.*

Prior to the final disposition of the lawsuit, Gulf Oil sought a temporary injunction against Albert that would prevent him from denying Gulf Oil and its agents access to the 13.2 acres for the purpose of laying pipeline and "preventing them from performing any act appropriate to ownership of same, and from further molesting them or threatening them with bodily harm if they attempt to do such acts upon said premises." *Id.* at 542. At the hearing on Gulf Oil's petition, at least one of its agents testified that in October 1955, Albert obstructed Gulf Oil's "efforts to build a road across the 13.2 acres to a new well location." *Id.*

After the trial court heard from both parties, it granted Gulf Oil's request for temporary injunctive relief. Albert appealed, arguing, among other things, that Gulf Oil failed to show irreparable injury if its petition were denied and that Gulf Oil had an adequate remedy at law. *Id.* at 542–43.

In dissolving the temporary injunction, the Beaumont Court of Appeals stated that the trial court's order "almost had the effect of determining the merits of the parties' alleged titles to the disputed property; of disrupting the status quo of the parties, and depriving [Albert's], under threat of contempt, of any use of the property whether consistent, or not, with [Gulf Oil]'s use of the pipe line." *Id.* at 542. The appellate court explained,

> Of [Albert]'s six points of error, we overrule those relating to [Gulf Oil]'s failure
> to establish an adequate remedy at law, irreparable injury, pressing necessity or

14

the insolvency of [Albert], *as it appears that these matters are of little, if any, consequence upon a hearing for a temporary injunction*, other matters considered. We sustain those points, however, *relating to the failure of the court to preserve the status quo of the parties pending trial of the merits and, in effect, transferring possession of the property to [Gulf Oil]*.

*Id.* at 542–43 (emphasis added).  The appellate court stated that it was mindful of the trial court's broad discretion in determining whether to issue an injunction.  *Id.* at 544.  Yet, it concluded, "Nevertheless, we are presented no authorities, and find none, to the effect that a trial judge could, without an abuse of discretion, issue a temporary injunction under this like state of facts."  *Id.*

Here, Megatel argues that the subject matter of this lawsuit is the May 23, 2024, letter agreement and that the status quo was fixed the day Taylor allegedly breached its terms.  In support of its position, Megatel emphasizes that it worked with Taylor on Anacapri Phase 2 of the residential-development project for several months after Taylor signed the May 23 letter.  Then, suddenly, Taylor became uncooperative and breached the parties' agreement by refusing to permit Megatel to enter the Armstrongs' property to construct the water-drainage channel.  According to Megatel, because the contract was in effect at the time of Taylor's breach, maintaining the status quo meant that the parties would continue to act in accordance with the terms of the contract, thereby giving Megatel the right to enter the Armstrongs' property and make modifications to it before the disposition of the underlying lawsuit.

The Armstrongs contend that the subject of the lawsuit is also the subject of the May 23 letter, namely, the Armstrongs' land and Megatel's ability or inability to alter it.  Furthermore, the Armstrongs maintain that the May 23 letter is not an enforceable contract and, therefore, the

15

trial court should have fixed the status quo at a time before the letter's execution; that is, when their land was in its natural state.

The trial court mentioned the status quo only once in its temporary injunction order, stating,

> Accordingly, to preserve the status quo during the pendency of this action,[the Armstrongs], and their officers, agents, employees, attorneys, and all persons acting in concert with them, are hereby **RESTRAINED AND ENJOINED** from:
>
> - Denying or obstructing [Megatel's] reasonable access to the subject property for the purpose of conducting drainage construction as described in the parties' May 23, 2024[,] agreement;
>
> - Interfering with or delaying the completion of such construction;
>
> - Revoking or purporting to revoke the access previously granted by the Agreement;
>
> - Taking any action to impede, prevent, or delay the implementation of the agreed drainage improvements essential to the Anacapri Phase 2 development.

Based on the findings in its order, the trial court seemingly agreed with Megatel and determined that Megatel and the Armstrongs had been "peaceable" up until the time of Taylor's alleged breach. From there, it "fixed" the status quo at a time just before that event occurred, leaving the terms of the contract intact.

The Tyler Court of Appeals addressed the issue of "fixing" the status quo in *Layton v. Ball*, 396 S.W.3d 747 (Tex. App.—Tyler 2013, no pet). In that case, several individuals ("the range owners") bought approximately 11.5 acres of land in Smith County, believing that it would make an ideal shooting range. *Id.* at 750. In January 2011, the range owners began operating the

16

property as a private shooting club. *Id.* The homeowners, who lived directly east of the gun range, feared for their safety.[7] *Id.* At least one of them "believed that bullets were leaving the shooting range and entering his property." *Id.* Alleging that the gun range was a nuisance, the homeowners filed suit and sought a temporary injunction from the trial court that prevented the range owners from using the property as a gun range.[8]

The trial court granted the homeowners' requested injunctive relief. *Id.* The range owners appealed, arguing, in part, that the status quo was the continued operation of the gun range because it was already in operation when the homeowners filed suit to close it. *Id.* at 754. The appellate court held that the range owners' argument erroneously "presupposes that the activity conducted on the date suit was filed necessarily controls the status quo determination." *Id.* The appellate court explained that "the status quo is the last actual, peaceable, noncontested status that preceded the controversy." *Id.* It noted that merely because some time had passed "before the danger became apparent" and the homeowners sued the range owners, that passage of time did "not necessarily fix the status quo on the date suit was filed." *Id.* The appellate court went on to hold that the trial court did not abuse its discretion in determining that "the last actual, peaceable, noncontested status that preceded the controversy was prior to the property's use as a shooting range." *Id.*

---

[7]One of the homes was located approximately twenty yards away from the shooting range. *Layton*, 396 S.W.3d at 750.

[8]In the alternative, the homeowners asked the trial court to order the range owners to abate the nuisance by "making all reasonable improvements to protect the homeowners and their property from the danger presented by the shooting range." *Id.*

Here, contrary to the trial court's determination, the subject of the underlying lawsuit is the enforceability of the May 23, 2024, letter, and this determination directly affects the parties' rights regarding the Armstrongs' land. Without the land, there would be no controversy. Furthermore, the evidence presented during the trial court's hearing on Megatel's petition shows that Megatel had not begun any modifications to the Armstrongs' land. During oral argument, Megatel conceded that no work had been done on the property. As such, the Armstrongs' land remained untouched (1) during the discussions between the parties prior to the creation of the purported agreement, (2) after the parties entered into the purported agreement, (3) at the time Megatel brought suit against the Armstrongs, (4) during the entire existence of the trial court's temporary injunction, and (5) during the pendency of this appeal. Simply stated, the Armstrongs' land has remained in its natural state since before this suit was filed and should remain so until a final judgment is entered in this case.

Accordingly, the trial court erred when it granted Megatel temporary injunctive relief because it altered—rather than preserved—the status quo.

### C.     Decision on the Merits

Texas courts have held, and continue to hold, that disrupting the status quo prior to the disposition of the merits in the underlying case is prohibited and that the trial court cannot render a decision on the merits of the case. *See Marshall v. Marshall*, No. 14-25-00322-CV, 2026 WL 585157, *8 (Tex. App.—Houston [14th Dist.] March 3, 2026, pet. filed); *Clint Indep. Sch. Dist.*, 487 S.W.3d at 555; *Stewart Beach Condo. Homeowners Ass'n, Inc. v. Gili N Prop Invests., LLC*, 481 S.W.3d 336, 346 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Leighton v. Rebeles*, 343

S.W.3d 270, 273 (Tex. App.—Dallas 2011, no pet.); *Friona Indep. Sch. Dist. v. King*, 15 S.W.3d 653, 657 (Tex. App.—Amarillo 2000, no pet.); *Bright Land & Cattle, LLC*, 2017 WL 986181, at *2; *Iranian Muslim Org. v. City of San Antonio*, 615 S.W.2d 202, 208 (Tex. 1981); *Brooks v. Expo Chem. Co.*, 576 S.W.2d 369, 370 (Tex. 1979); *Davis v. Huey*, 571 S.W.2d 859, 861–62 (Tex. 1978).

Here, the trial court's temporary injunction order was effectively dispositive as to the merits of Megatel's breach-of-contract and declaratory-judgment claims (whether there was a valid, enforceable contract that was breached by the Armstrongs), since it would allow work on the property to commence. By fixing the status quo at a time just prior to the commencement of the construction of the drainage channel, the trial court had to determine that the May 23, 2024, letter constituted an enforceable agreement, which is the main claim in Megatel's lawsuit. It then, by allowing the construction of the drainage channel, prematurely awarded Megatel part of the relief it sought in its underlying lawsuit. As a result, the Armstrongs immediately lost control of a portion of their property and the opportunity to defend themselves in the underlying lawsuit *before* Megatel was granted the right to make substantial changes to the land. *See Bright Land & Cattle*, 2017 WL 986181, at *3 ("Finding that such an easement actually existed and specifying its actual metes and bounds afforded Matra not only part of the declaratory relief it sought but effectively resolved pivotal issues underlying the claims of tortious interference and promissory estoppel."). Thus, for all practical purposes, Megatel's claims were already adjudicated on their merits.

19

For these reasons, we find that the trial court erred when it effectively determined the merits of Megatel's breach-of-contract and declaratory judgment claims.

## III.  Conclusion

Accordingly, we reverse the trial court's order granting the temporary injunction.  The temporary injunction is vacated, and we remand this case to the trial court for further proceedings.

Scott E. Stevens
Chief Justice

Date Submitted:   March 25, 2026
Date Decided:     July 8, 2026